15 MAG      3122

Approved: _____
          SAGAR K. RAVI
          Assistant United States Attorney

Before:   THE HONORABLE GABRIEL W. GORENSTEIN
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA           :   **SEALED COMPLAINT**

        - v. -                     :   Violations of 18 U.S.C.
                                       §§ 1343, 1349 and 2
MARCOS ELIAS,                      :
                                       COUNTY OF OFFENSE:
                  Defendant.       :   NEW YORK

- - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        CHRISTOPHER S. DELZOTTO, being duly sworn, deposes and
says that he is a Special Agent with the Federal Bureau of
Investigation, and charges as follows:

COUNT ONE
(Conspiracy to Commit Wire Fraud)

        1.    From at least in or about June 2014, up to and
including at least in or about July 2015, in the Southern
District of New York and elsewhere, MARCOS ELIAS, the defendant,
and others known and unknown, willfully and knowingly, did
combine, conspire, confederate, and agree together and with each
other to commit wire fraud, in violation of Title 18, United
States Code, Section 1343.

        2.    It was a part and object of the conspiracy that
MARCOS ELIAS, the defendant, and others known and unknown,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, would and did transmit and cause
to be transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, and by such conduct, would

and did affect a financial institution, in violation of Title
18, United States Code, Section 1343.

(Title 18, United States Code, Section 1349.)

COUNT TWO
(Wire Fraud)

3.    From at least in or about June 2014, up to and
including at least in or about July 2015, in the Southern
District of New York and elsewhere, MARCOS ELIAS, the defendant,
willfully and knowingly, having devised and intending to devise
a scheme and artifice to defraud, and for obtaining money and
property by means of false and fraudulent pretenses,
representations, and promises, did transmit and cause to be
transmitted by means of wire, radio, and television
communication in interstate and foreign commerce, writings,
signs, signals, pictures, and sounds for the purpose of
executing such scheme and artifice, and by such conduct, did
affect a financial institution, to wit, ELIAS fraudulently
obtained funds in a brokerage account at a financial institution
by means of false and fraudulent pretenses and representations
transmitted through email using the Internet.

(Title 18, United States Code, Sections 1343 and 2.)

The bases for my knowledge and for the foregoing
charges are, in part, as follows:

4.    I am a Special Agent with the Federal Bureau of
Investigation, and I have been personally involved in the
investigation of this matter.  This affidavit is based upon my
personal participation in the investigation of this matter, my
conversations with law enforcement agents, witnesses and others,
as well as my examination of reports and records.  Because this
affidavit is being submitted for the limited purpose of
establishing probable cause, it does not include all the facts
that I have learned during the course of my investigation.
Where the contents of documents and the actions, statements and
conversations of others are reported herein, they are reported
in substance and in part, except where otherwise indicated.

5.    Based on my conversations with representatives of a
financial institution headquartered in New York, New York (the
"Firm") and my review of documents and records from the Firm, I
have learned, among other things, the following:

2

a.   Since at least in or about 2012, a Brazilian
company (the "Client") held a brokerage account in the name of
the Client (the "Client Account") with the Firm.  The Firm's
records listed the contact for the Client Account in the name of
a Client employee ("Client Employee-1") with a contact email
ending in the domain "@[Client].com.br."

b.   From at least in or about January 2013, up to and
including in or about June 2014, there had been no trading
activity in the Client Account, which had deposits totaling
approximately $752,000 in cash during that period.

c.   On or about December 16, 2013, Client Employee-1
sent an email from the domain "@[Client].com.br." to the Firm
that stated the following, in substance and in part:  "I'm
writing about the balance of our account with [the Firm].  We
want to bring the money back to Brasil and close our account
since we are longer trading."  The Firm responded, in substance
and in part, that the Firm would need a letter or document
identifying the authorized individuals that could take such
action on behalf of the Client Account.

d.   Beginning in or about June 2014, the Firm began
remediating accounts that were missing certain documentation,
including the Client Account.  On or about June 19, 2014, a
managing director at the Firm ("Firm Employee-1") instructed a
co-conspirator not named herein ("CC-1"), who was a senior vice
president at the Firm in Chicago, Illinois at the time, to
contact the Client in order to obtain the missing documentation
for the Client Account.

e.   On or about June 20, 2014, CC-1 received an email
in CC-1's Firm email account containing certain account
information regarding the Client Account, including the account
number, opening date, account name, mailing address, legal
address, and phone number.  Within approximately two hours after
receiving this email, CC-1 forwarded the email containing the
Client Account information to CC-1's personal email account
ending in the domain "@gmail.com" (the "CC-1 Personal Email
Account"), and then CC-1 forwarded the same email from the CC-1
Personal Email Account to an email account in the name of MARCOS
ELIAS, the defendant.

f.   Subsequently, on or about June 20, 2014, CC-1
represented to several of the Firm's employees, including a
senior vice president in New York, New York ("Firm Employee-2"),
that CC-1 was in contact with the Client.  For example, CC-1

3

emailed Firm Employee-2 stating, in substance and in part, that
CC-1 had spoken with the Client's money manager.  CC-1 also
asked Firm Employee-2, in substance and in part, the following
questions in the same email:  (1) Is the Client receiving any
type of communications from the Firm?; (2) Is the Firm sending
the Client statements?; (3) What is required for the Client to
start trading again?; and (4) What if the Client asks for a
wire?  Firm Employee-2 responded to CC-1's email by stating, in
substance and in part, that the Client had no web access to the
Client Account, was not receiving email statements, and that
Firm Employee-2 assumed that the Client had been receiving
monthly statements in the mail to an address in Brazil.

       g.   Subsequently, on or about June 20, 2014, CC-1
emailed Firm Employee-2 asking, in substance and in part,
whether Firm Employee-2 could confirm that the Firm was sending
statements to the Client and when the last statement was sent
out.  CC-1 also informed Firm Employee-2, in substance and in
part, that the Client would like to know the exact amount of
money in the Client Account and what was required to wire the
money to the Client's bank account in Luxembourg.  Firm
Employee-2 confirmed the same day that statements had been
mailed to the Client and that the last statement was mailed in
June.  In addition, Firm Employee-2 informed CC-1, in substance
and in part, that there was $752,384.57 in the Client Account,
that a request with banking instructions should be sufficient to
initiate a wire transfer, and that the Firm did not have an
authorized signature list for the Client so a request on the
Client's letterhead would be ideal.

       h.   On or about June 23, 2014, ELIAS sent an email to
a Client employee ("Client Employee-2") that stated the
following, in substance and in part, in Portuguese[1]:  "I am
Marcos Elias, manager of resources in Sao Paulo.  The Managing
Director of [the Firm] asked for my assistance in contacting you
as you ([the Client]) have an account in the aforementioned
institution with a registration needing completion. . . . I
await your response."  The signature block on the email
indicates that ELIAS works with a company located in São Paulo,
Brazil.  I have further been informed by the Firm that ELIAS was
not authorized by a managing director of the Firm to contact
Client Employee-2 regarding the Client Account.

---

[1] This quotation and certain others set forth in this Affidavit
are based on a draft English translation.

4

i.    On or about June 25, 2014, CC-1 received an email
from an email address that appeared to contain the name of
Client Employee-2 (the "Client Email Account"), which stated the
following, in substance and in part:    "Dear Evandro, Please
follow the instructions of the attached file. BR."[2]    The attached
file purports to be a letter on the Client's letterhead stating
the following, in substance and in part:    "To [the Firm] Please,
I would like you to wire all cash balance in my account:
[Client name and Client Account number], according to the
instructions below. . . . Please also close my account after
wire is done.    Thank you.    Sincerely, [purported signature of
Client Employee-2]" (the "June 25 Wire Instructions").    The June
25 Wire Instructions directed that the funds in the Client
Account be transferred to an account in the name of "Carrol
Gardens LTD" ("Bank Account-1") at a bank with a main office in
New York, New York ("Bank-1").    CC-1 responded to the Client
Email Account stating, in substance and in part, that CC-1 would
send the instructions "right away to my client service area."
As set forth below, Client Employee-2 was not authorized to sign
documents on behalf of the Client and the June 25 Wire
Instructions were falsified and contained a forged signature for
Client Employee-2.    Accordingly, I believe that an individual
falsely claiming to be Client Employee-2 created and used the
Client Email Account in order to transmit the falsified June 25
Wire Instructions to CC-1.

j.    Subsequently, on or about June 25, 2014, CC-1
forwarded the June 25 Wire Instructions to Firm Employee-2 and
stated, in substance and in part, that CC-1 thought the swift
code or ABA routing number was missing from the instructions and
that CC-1 would request that the instructions be resent
following the standard wire format.    Firm Employee-2 responded
to CC-1 asking, in substance and in part, who "Carrol Gardens,
Ltd" was, and stating that the funds needed to be paid to an
account in the name of the Client.    CC-1 subsequently emailed
the Client Email Account the same day and stated the following,
in substance and in part:    "Please redo the letter with the
complete wire instructions like below: . . . FFC:    (if for
further credit of . . . it might be he [sic] '[Client] Com.
Ind.', or whatever your banker provides."

---

[2] This email appears to have been intended to create the
impression that it was sent by Client Employee-2 on behalf of
the Client, but the initials of Client Employee-2 in the
signature of the email were in the wrong order.

k.    Subsequently, on or about June 25, 2014, CC-1
sent an email to two employees of the Firm ("Firm Employee-3"
and "Firm Employee-4") and ELIAS that stated the following, in
substance and in part:  "[Firm Employee-3 and Firm Employee-4],
I'd like to introduce you to a great friend of mine and future
client of [the Firm], Marcos Elias.  Marcos is practically my
brother!  He wants to open an account at [the Firm] . . . ."  On
or about June 27, 2015, ELIAS responded to Firm Employee-3 and
Firm Employee-4, copying CC-1, and stated, in substance and in
part, that ELIAS was creating a new company in Panama and would
send documentation to open a new account in no more than 15
days.

l.    On or about June 26, 2014, CC-1 received an email
from "[first name of Client Employee-2] @[Client]indcom.com.br"
(the "Client-indcom Email Account") that stated the following,
in substance and in part:  "Dear Evandro, I'll be providing
instructions to wire transfer the total amount deposited at [the
Client's] account at [the Firm] in the next 15 days and asking
yourselves the kindness of closing it right after the wire
transfer is completed and balance is zeroed.  Best wishes,
[Client Employee-2]."  CC-1 responded to the Client-indcom Email
Account by stating, in substance and in part, that CC-1 would
wait for the instructions.  As set forth further below, I
understand that the domain for the Client's email addresses is
"@[Client].com.br" and not the domain "@[Client]indcom.com.br."
Accordingly, I believe the Client-indcom Email Account was used
in order to create the false impression that emails sent from
the Client-indcom Email Account were sent on behalf of the
Client by Client Employee-2.

m.    On or about July 2, 2014, CC-1 received an email
from the Client-indcom Email Account that stated the following,
in substance and in part:  "Evandro just to ratify here from one
week we'll be wire transfering [sic] total amount of [CLIENT]
IND COM and then proceed to closing the account Best Regards,
and thanks for the prompt support, [first two initials and last
name of Client Employee-2]."  CC-1 responded to the Client-
indcom Email Account with the following, in substance and in
part:  "Agreed . . . Tks."

n.    On or about July 15, 2014, CC-1 received another
email from the Client-indcom Email Account that stated the
following, in substance and in part: "DEAR EVANDRO PLEASE FOLLOW
THE INSTRUCTIONS ACCORDING TO THE ATTACHED FILE BEST REGARDS
[last name of Client Employee-2]."  Similarly to the June 25
Wire Instructions, the attached file purports to be a letter on

6

the Client's letterhead stating the following, in substance and
in part: "To [the Firm] Please, I would like you to wire all
cash balance in my account:  [Client name and Client Account
number], according to the instructions below. . . . Please also
close my account after wire is done.  Thank you.  Sincerely,
[purported signature of Client Employee-2]" (the "July 15 Wire
Instructions").  The July 15 Wire Instructions directed that the
funds in the Client Account be transferred to an account in the
name of "[CLIENT] COM. IND." ("Bank Account-2") at a bank in
Luxembourg ("Bank-2").  CC-1 responded to the Client-indcom
Email Account by writing "Will do."

    o.   On or about July 15, 2014, CC-1 forwarded the
July 15 Wire Instructions to Firm Employee-2 and requested that
Firm Employee-2 execute the wire instructions and close the
Client Account.

    p.   Firm Employee-2 subsequently initiated the
execution of the July 15 Wire Instructions (the "July 15 Wire
Transfer"), and the $752,384.57 in the Client Account was
transferred to Bank Account-2 at Bank-2 in Luxembourg.

    q.   On or about May 11, 2015, Client Employee-1
advised the Firm, in substance and in part, that Client
Employee-2 worked at the Client but that the July 15 Wire
Instructions were falsified and that the signature of Client
Employee-2 had been forged.  Furthermore, Client Employee-1
advised that Client Employee-2 was not authorized to sign any
documents for the Client.

   6.   Based on my conversations with Client-Employee-2, I
have learned, among other things, the following:

    a.   Client Employee-2 has never been authorized to
initiate wire transfers on behalf of the Client and has never
initiated wire transfers on behalf of the Client.

    b.   Client Employee-2 did not create the Client Email
Account and has never used the Client Email Account.

    c.   Client Employee-2 did not create the Client-
indcom Email Account and has never used the Client-indcom Email
Account.

    d.   Client Employee-2 did not sign the June 25 Wire
Instructions or the July 15 Wire Instructions.

       e.   The signature of Client-Employee-2 on the June 25 Wire Instructions and the July 15 Wire Instructions does not belong to Client Employee-2 and was forged.

       f.   Client Employee-2 has never spoken with MARCOS ELIAS, the defendant, or CC-1.

    7.   Based on my conversations with Client Employee-1 and another Client employee ("Client Employee-3"), I have learned, among other things, the following:

       a.   Client Employee-1 and Client Employee-3 were the only employees of the Client that would have interacted with the Firm regarding the Client Account.

       b.   The Client did not initiate any wire transfers with respect to the funds in the Client Account.

       c.   Other than the Client Account, the Client does not have any bank or brokerage accounts outside of Brazil and does not have any accounts in Luxembourg.

       d.   Client Employee-1 and Client Employee-3 have never spoken with MARCOS ELIAS, the defendant, or CC-1.

       e.   The Client's email addresses have the domain name "@[Client].br.com."  The Client does not have email addresses with the domain name "@[Client]indcom.com.br."

       f.   The Client never received the funds wired from the Client Account to Bank-2 and is currently working to locate the funds.

    8.   Based on my investigation of Bank Account-1 at Bank-1 in New York, I have learned the following:

       a.   Bank Account-1 was held in the name of a British Virgin Islands ("BVI") company.

       b. Bank Account-1 was beneficially owned by an individual who has been a business associate of MARCOS ELIAS, the defendant, since at least in or about October 2013.

       c. Bank Account-1 was closed on May 29, 2015, approximately 18 days after the Client advised the Firm that the July 15 Wire Instructions were falsified.

9.   Based on my investigation of Bank Account-2 at Bank-2 in Luxembourg, I have learned the following:

a.   Bank Account-2 was opened in or about July 2014 and held by "[Client name] Com. Ind. Corp," a company with a name similar to the Client that was constituted in Panama on or about July 7, 2014, approximately a week before the July 15 Wire Transfer.

b.   On or about July 18, 2014, Bank Account-2 was credited with $752,384.57 from the Client Account in connection with the July 15 Wire Transfer.

c.   The beneficial owner of Bank Account-2 was MARCOS ELIAS, the defendant.   Based on my training and experience, I believe Bank Account-2 was held by a company with a name similar to the Client in order to create the false impression that the funds in the Client Account were being transferred to an account beneficially owned by the Client when in fact such account was beneficially owned by ELIAS.

d.   On or about May 27, 2015, approximately two weeks after the Client advised the Firm that the July 15 Wire Instructions were falsified, Bank Account-2 was closed.

10.   Based on my review of records received from Google, Inc., I have learned, among other things, the following:

a.   The Client Email Account was created on or about June 25, 2014, the same day that the Client Email Account was used to send the falsified June 25 Wire Instructions to CC-1.

b.   On or about June 26, 2014, the Client Email Account was used to register the domain "@[Client]indcom.com.br" with a company in Brazil.   Such domain is the same as the domain for the Client-indcom Email Account.

9

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of MARCOS ELIAS, the defendant, and that he be arrested and imprisoned or bailed, as the case may be.

Christopher S. Delzotto
Special Agent
Federal Bureau of Investigation

Sworn to before me this
2nd day of September, 2015

THE HONORABLE GABRIEL W. GORENSTEIN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK